Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

RECEIVED

CLERK

Case: 1:21−cv−02535  JURY DEMAND
Assigned To : Sullivan, Emmet G.
Assign. Date : 9/29/2021
Description: Pro Se Gen. Civ. (F−DECK)

Dayna Staggs

)
)
)
)
*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

Jury Trial:  *(check one)*  ☑ Yes  ☐ No

-v-

Smith & Wesson
Liberty Mutual Insurance
ASP/Secure America/Allied Universal

)
)
)
)
)
)
)
)
)

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

## COMPLAINT FOR A CIVIL CASE

### I.   The Parties to This Complaint

#### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Dayna Staggs |
| Street Address | 27710 King William Rd |
| City and County | West Point |
| State and Zip Code | VA 23181 |
| Telephone Number | 804-399-1616 |
| E-mail Address | daynastaggs74@gmail.com |

#### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known).*  Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

|  |  |
|---|---|
| Name | Clem C. Trischler |
| Job or Title *(if known)* | Attorney |
| Street Address | One Oxford Centre |
| City and County | Pittsburgh |
| State and Zip Code | PA 15219 |
| Telephone Number | 412-263-1816 |
| E-mail Address *(if known)* | CCT@pietragallo.com |

Defendant No. 2

|  |  |
|---|---|
| Name | Liberty Mutual Insurance |
| Job or Title *(if known)* | Legal Claims |
| Street Address | 350  E 96th Street |
| City and County | Indianapolis |
| State and Zip Code | IN 46240 |
| Telephone Number | 317-581-6400 |
| E-mail Address *(if known)* | info@libertymutual.com |

Defendant No. 3

|  |  |
|---|---|
| Name | American Security Programs/Allied Universal Security |
| Job or Title *(if known)* | Legal Department |
| Street Address | 1881 Campus Commons Drive |
| City and County | Reston Fairfax |
| State and Zip Code | VA  20191 |
| Telephone Number | 703-955-5478 |
| E-mail Address *(if known)* | info@aus.com |

Defendant No. 4

|  |  |
|---|---|
| Name |  |
| Job or Title *(if known)* |  |
| Street Address |  |
| City and County |  |
| State and Zip Code |  |
| Telephone Number |  |
| E-mail Address *(if known)* |  |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?   *(check all that apply)*

☐ Federal question          ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff Staggs is a citizen of the United States and the State of Maryland. Defendant Smith & Wesson, Inc. has a principal place of business in Pittsburgh and, accordingly, is a citizen of Pittsburgh PA. The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

    The plaintiff, *(name)* Dayna Staggs                            , is a citizen of the State of *(name)* Virginia                            .

    b.    If the plaintiff is a corporation

    The plaintiff, *(name)*                            , is incorporated under the laws of the State of *(name)*                            ,

    and has its principal place of business in the State of *(name)*                            .

    *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

    The defendant, *(name)*                            , is a citizen of the State of *(name)*                            . Or is a citizen of *(foreign nation)*                            .

    b.    If the defendant is a corporation

The defendant, *(name)* Smith & Wesson _____, is incorporated under
the laws of the State of *(name)* PA _____, and has its
principal place of business in the State of *(name)* District of Columbia .
Or is incorporated under the laws of *(foreign nation)* MA ,
and has its principal place of business in *(name)* Reston VA .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:
Jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff Staggs is a citizen of the United States and the State of Maryland. Defendant Smith & Wesson, Inc. has a principal place of business in Pittsburgh and, accordingly, is a citizen of Pittsburgh PA. The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2). The Smith Wesson MP9 gun discharge at issue occurred at (GAO) Government Accountability Office 441 G street NW Washington DC on October 1, 2019. In particular, the discharge at issue, the injuries suffered at issue, and the medical treatment for Federal Officer Staggs injuries all treated at Washington DC. Incident occured Federal building of GAO Sub Basement. Staggs Rushed to Medstar Washington Hospital Center Washington DC. Defendant Smith and Wesson do business in and are subject to personal jurisdiction in this judicial district. Smith & Wesson has identified two M&P Shield EZ Pistols on which the hammers manufactured by our supplier were cracked. In those firearms, the hammer failed to fully engage the sear, causing the round to fire, cycling the slide, and

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Resulting in Legal Damages Smith Wesson, Liberty Mutual, American Security Programs dba Allied Universal acts and omissions caused Plaintiff to sustain legal damages. Plaintiff is entitled to be compensated for the personal injuries and damages that he has sustained and will sustain, including:
i. The amount of medical expenses necessarily incurred in the treatment of Plaintiff ' s injuries from the date of the incident in question up to the time of trial;
ii. The amount of medical expenses in the treatment of Plaintiff ' s injuries that, in reasonable medical probability, will be incurred in the future:

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that he have a judgment against Defendants for actual damages in excess of the minimum jurisdictional limits of this Court, pre-and post-judgment interest as allowed by law, costs of suit, and all other relief, at law or in equity, to which Plaintiff may be justly entitled.

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          09/28/2021

Signature of Plaintiff

Printed Name of Plaintiff     Dayna Staggs

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Metropolitan Police Department

CCN #19174717 — Event # 19174717 Public Incident Packet

## CCN #19174717 – PUBLIC INCIDENT REPORT

| REPORT DATE / TIME | DISTRICT / PSA | EVENT START DATE / TIME - EVENT END DATE / TIME | INCIDENT STATISTICS |
|---|---|---|---|
| Oct 01, 2019 01:54 | First District / 101 | Oct 01, 2019 00:20 – Oct 01, 2019 00:25 | |
| RESPONDING OFFICER | | WEATHER | |
| Walker Cleary (#11744) – MPD | | Cloudy | |
| ASSISTING OFFICER (ASSIST TYPE) | | | |
| John Adjetey (#11028) (Assisting Officer) | | | |
| TELETYPE DATE / TIME | TELETYPE # | PERSON NOTIFIED AT TELETYPE | SHOTS FIRED   SHOTS EFFECT |
| | | | ☐ YES ☐ NO    ☐ YES ☐ N... |

## REPORTING PERSON

NAME

R-1 HARLEY EDWARD SMITH

HOME ADDRESS

4503 RENA RD, SUITLAND, MD 20746, UNITED STATES, 6531 LIVINGSTON RD, OXON HILL, MD 20745, UNITED STATES

## PROPERTY & ITEMS

| STATUS / REASON FOR CUSTODY | DESCRIPTION | QTY | DECLARED / FORFEITURE VALUE |
|---|---|---|---|
| Seized / Evidence | Smith and Wesson MP9 Smith & Wesson | 1 | |

## CCN #19174717 – PUBLIC NARRATIVE

On October 1, 2019, officers responded to 441 G St NW for a shooting. Once on scene, officers located SUB-1 who was suffering from a gunshot wound to the upper right leg. W1 stated that SUB-1 had been in the weapons clearing room attempting to place the firearm in his holster when the firearm discharged. SUB-1 was transported to the hospital by Medic 2 for further medical treatment.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DAYNA STAGGS,** | § CIVIL ACTION NO.: |
| | § |
| Plaintiff, | § |
| | § |
| | § |
| v.§ | |
| | § |
| | § |
| **SMITH & WESSON BRANDS INC.** | § JURY DEMANDED § |
| **LIBERTY MUTUAL INSURANCE.** | |
| **AMERICAN SECURITY PROGRAMS ETAL** | |
| § | § |
| Defendants, | § |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Dayna Staggs files this Original Complaint against Defendants Smith & Wesson, and would respectfully show the following:

**SUMMARY OF ACTION**

1. This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to defendant Smith and Wesson negligence, defective Smith & Wesson, and unfair and deceptive marketing practices regarding a semi-automatic firearm. Specifically, a striker-fired, semi-automatic pistol known as the "MP9" has fired without a trigger pull on law enforcement agents and civilians across the nation over the last five years.

2. The "MP9" meaning Military Police is a striker-fired, semi-automatic pistol that was introduced to the market in or around 2014. Its trigger weight ranges between 4.25 pounds of pressure.

3. A striker-fired pistol differs from the traditional "hammer-fired." It has no external hammer to be pulled back by the thumb; rather, it has an internal "striker" that is held back under

1

constant spring pressure like a bow and arrow. Once the slide is moved or "racked" backward, then the weapon is fully cocked. The only component holding the striker back is the weapon's "sear." In this illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.



4. In January 2014, the "MP9" was introduced in North America. Since its inception, there have been at least fifty-four reported un-commanded discharges of the "MP9" involving federal agents, state and local police officers, and civilians. Approximately ten lawsuits brought by individual plaintiffs, and three class actions, have been filed against Smith & Wesson alleging that the "MP9" is defective, poorly made, and dangerous.

5. Staggs, a 53-year-old DC Special Police Officer and 22+year veteran working at GAO US Government Accountability Police Department (SPO-DC 205693) incurred severely and permanently disfiguring injuries when his "MP9" Carry pistol un-commanded discharged by itself while fully holstered in his plastic holster provided by the American Service Protection /Secure America Argenbright/Federal Contractor Employer. "MP9" weapon discharged and shot him on October 1, 2019.  Close range bullet entered  right Leg narrowly Chipped TIBIA FIBULA missing major artery, The Bullet ammunition casing and metal fragments are lodged in his lower calf

muscle, and metal fragments in the lower part of nerves in the right foot.

6. As a result of the "MP9" gunshot, Staggs has incurred life damages to all his central nerve damage right Leg narrowly Chipped TIBIA FIBULA in the form of pain radiating down his right leg and spreading to his knee/foot. When there is cold air, he can feel metal bullet fragments, and every day, every night severe sharp moving pain numbness.  Staggs is unable to sit for very long without shifting back and forth to attempt to relieve unremitting pain and swelling and severe stress.



7. Staggs "MP9" should not have been discharged without the trigger being pulled, holstered, or un-holstered. In its "Safety Without Compromise" marketing materials for the "MP9". Defendants Smith & Wesson is going to make a lot of people happy with the announcement of new M&P EZ Shield concealed carry pistols without manual safeties. The original Shield pistols have thumb safeties on the side. However, in this instance this safety feature failed, causing life-threatening lethal damage the round caused a close-range gunshot wound, ripping leg muscles apart and causing

3

severe internal bleeding and life-threatening blood clots and bleeding to Stagg's upper and lower Leg muscles, as described by Medstar Washington Hospital Center Emergency room trauma doctors. The 9mm Caliber hollow point bullet and fragments remain lodged embedded deep into his right calf muscle and lower leg. As seen above in this X-ray.



*Defendants Smith Wesson safety elements into every necessary feature on this pistol. From the trigger to the striker and even the magazine, the "MP9" won't fire unless you want it to.*

8. Despite this express representation, which "MP9" has made for the last seven years to Xray present day, Staggs's weapon also fired without the trigger being pulled.  9. Staggs brings causes of action seeking actual, compensatory, and punitive damages for Smith & Wesson's negligence in distributing a defective product, and breach of express and implied warranties

4

contained in Smith & Wesson literature about the weapon, and its defective deSmith & Wessonn, and its manufacturing defects.

10. Despite knowledge of safety defects with the "MP9" fire control unit and build quality as early as February 2016, if not long before, "MP9" has recklessly failed to issue a mandatory recall of the weapon. Until after month of this Federal incident October 1, 2019 later a Recall March 1, 2020 and October 31st 2020.  December 18, 2019  GAO announcement of Early mandatory retirement  age to GAO - Capitol Hill law enforcement at the age of 57 years old.

11. The recklessness of Smith and Wesson refusal to issue a mandatory recall is compounded by Smith and Wesson full knowledge of serious wounds inflicted upon numerous law enforcement agents and civilians across the country over the last five years to the present, whether the weapon is in its original or "upgraded" form.

## JURISDICTION AND VENUE

12. Jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff Staggs is a citizen of the United States and the State of Maryland. Defendant Smith & Wesson, Inc. has a principal place of business in Pittsburgh and, accordingly, is a citizen of Pittsburgh PA. The amount in controversy substantially exceeds, exclusive of interest and costs,  $75,000.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2).  The discharge at issue occurred at 441 G street NW Washington DC on October 1, 2019. In particular, the discharge at issue, the injuries suffered at issue, and the medical treatment for Federal Officer Staggs injuries all occurred at Medstar Washington Hospital Center Washington DC. Defendant Smith and Wesson do business in and are subject to personal jurisdiction in this judicial district.

## PARTIES

14. Staggs is a 52-year-old is Licensed District of Columbia who worked as a Federal

Police Officer licensed by the MPD, Navy, and Homeland Security, police DOD department for many years. He has qualified on DC employer-issued firearms, Homeland security qualified to carry including the Glock 17, twice a year for the last over 20 years. He has suffered severe, permanent physical, mental, injury, nerve damage, and disfigurement to the upper leg and lower leg parts of his body, internal bone damage as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of Smith and Wesson.

15. Smith and Wesson. (hereinafter referred to as "MP9" and/or "Defendant") Smith Wesson manufactures firearms for military commercial markets in Washington DC, Virginia, Maryland, and throughout the United States, and internationally. It markets and sells its products through dealers. Smith and Wesson. The company was founded in 1856 and has its principal place of business in Springfield Massachusetts, West Virginia, and surrounding tri-state areas. Defendant is a corporation operated to accumulate monetary profit, that is organized under the laws of the State Massachusetts and its headquarters and principal place of business in the State of New Hampshire, but which does business systematically and continuously through the District of Columbia Security and US Government Contracting Agencies. It may be served by service upon its registration again for service: **American Security Programs Corporate office 1881 Campus Commons Dr. STE 105 Reston, Virginia.**

## ALLEGATIONS

### I. October 1, 2019, Defective Discharge

16. The incident occurred on Tuesday, October 1, 2019.

17. Staggs arrived at work around 10:29 pm. he was wearing a police uniform from Centerra Group LLC the Former Security Company, black police boots, and dark trousers with the short sleeve shirt uniform.

18. Staggs was patrolling 411 G Street as Post #18 The Roving foot patrol officer walked

roving the exterior officer. At the time he was carrying a Glock 17, issued by Centerra Group. He made contact by two-way radio at the beginning and ending of his patrol with GAO Police Command Center Dispatchers Patrick and Pamela Butcher.  Returning to the GAO Federal Building in Washington DC. Duane Harding of the Government GAO Security manager instructed Staggs "Why aren't you guys wearing American Security Protection new uniforms. Staggs responded sir " We were instructed to switch uniforms at midnight, sir. Harding then proceeded downstairs to the basement level to the GAO command center to verbally inquire about the matter to the police project manager office and management. At around 11:30, Staggs went to the command center. He was then instructed by Security Manager Mr. Singletary, and Special Police officers Lt. Harley Smith and Mr. Duane Harding to hurry up switching in American Security Programs uniforms and duty gear. And Takeoff Constellis dba Centerra Group Security uniforms.

At midnight officer Staggs disarmed, safely unloading his Glock 17 inside the Armory in the basement level of the GAO (Government Accountability Office) US Federal agency command center.  Racking the slide back, locked to rear removing the loaded magazine and the extra round in the chamber of the Glock 17.  Handing the safe weapon with the slide locked in the rear position to Lt Harley Smith. And observing the project manager Mr. Singletary then armed him with an EZ Oily weapon, a striker-fired Smith & Wesson "MP9".

19. GAO - American Security Program  DC city-issued duty handgun, "MP9" Carry 9mm.  At that time, while attempting to place the "MP9" Smith Wesson in a plastic holster, it discharged without him pulling the trigger. As soon as he heard the shot, he smelled gunpowder. He felt searing pain as if he had been stabbed with a hot metal rod. The gapping 4 in half-inch hole was in his upper right leg, the bullet did not exit, blood was on the floor of the armory, swelling along with discomfort pain felt was unbearable.

7

My information is that the discharge was witnessed by Lt. Harley Smith and that no trigger pull occurred. Smith immediately reacted and advised Staggs" not to move" as it might go off again.

20. He had a full magazine in the gun which holds 17 rounds. There was also a round in the chamber and two back up clip on his police belt.  Lt Smith removed the smith and Wesson and gave Staggs verbal commands, to step out of the armory very slowly.

21. The rounds issued by Staggs were 9mm jacketed hollow points.  22. After placing his holster, Staggs removed the rounds safely, handed it to Lt. Smith. While bleeding with a 4-inch hole in his leg, close range where the ammunition traveled.

Staggs slowly walked out of the GAO armory and performed Tourniquet on his leg, as tight as he could on himself, Later being told to sit down in the project manager's office, Blood pouring out of his body on the government floor and armory. While all of the Special police officers stood around and just observed, too afraid to assist. The GAO Government Agency policy is for all of the officers to have Red Cross CPR certification training. Staggs observed individuals in shock including the project manager and the government afraid to assist.

22. In an attempt to save his life, not going into shock saving his leg Staggs reverted to his Formal Military training from Navy (Federal Law Enforcement Training Center) and at (Special Police Officer) Centerra Training Center in Upper Marlboro MD.

23. The GAO command center notified the District of Columbia Metropolitan Police Department -   EMS. Once the Metropolitan Police of the District of Columbia arrived the Responding officer Cleary Walker Badge (#11744)- MPD and John Adjetey Badge (#11028) Assisting officer reinforced the right leg Tourniquet tighter to slow the bleeding and save the life of Officer Staggs. (Which is listed in the Metropolitan Police Department Report see attached)

24.  This incident happen in the Sub Basement of 441 G Street NW Washington DC

Government Accountability Office. GAO Dispatch and spoke with Washington Trauma Center for Ambulance to transport Officer Staggs to the Emergency room, Where Plaintiff was given pain medication immediately. Washington Trauma Doctors cut his pants and underwear off and proceed to CT scan her. He asked the EMTs to let his wife know that he loved them and asked that they not find out on social media.

25. Around 12:15 am, Metropolitan Police Detective stated he needed Staggs's statement to this incident and all parties involved should be held accountable for the incident. He asked did I Smith & Wesson- in for a New MP9 weapon and formal training sheet. I said no sir Lt. at Arms and the Project manager handed me an oily "MP9" weapon to load inside of the weapons clearing room as he places the firearm in his holster without pulling the trigger the firearm discharged. Written in the MPD Police report by responding officers.

26. As soon as he heard the shot, he smelled gunpowder. He felt heart and trauma burning pain in his upper right leg inner thigh, with a huge hole and black gun powder around it, felt as if he had been stabbed with a hot metal rod.

27. Staggs felt pain in his pelvic area but did not know where he had been shot.

28. Within a few minutes, the Metropolitan Police Department and Emergency Medical Services arrived. DC Fire and Metropolitan Police Department yelled for someone to grab towels, grabbed Staggs put him on Gurney, and Lift him flight of stairs to the elevators, and out the front entrance down two flights of stairs to the Ambulance told he heard everything was going to be okay, and that attending medical attendant took the vitals and all look normal, rushing Staggs to the Washington DC Medstar Trauma Center Emergency room Hospital for further immediate medical evaluation.

29. Staggs began feeling numbness in his right leg and lower back.

30 EMTs transported Plaintiff to Washington DC Medstar Trauma Center Hospital where

he was given pain medication immediately. Doctors cut his duty trousers and proceeded to CT scan him. He asked the EMTs to let her wife know that he loved them and asked that they not find out on social media.

31. Staggs had suffered an entrance wound near his outer thigh with no exit wound on his bottom leg. The bullet macerated tissue, the shredded muscle inside Staggs upper right leg, and it's inoperable. Staggs was held in the early hours of the morning and later released.   Staggs returned home later but had to return to Washington Hospital Center his wounds opened and soaked his mattress and sheets with blood.

32. Staggs has been through physical therapy at two different places since the "MP9" shot him. The resulting physical pain is unbearable, and he was unable to take anything for it due to pre-existing sensitivities to painkillers. The entrance wound is so close to his male nerves that it has caused severe daily emotional and mental distress. He is unable to sit for very long as the no exit wound. He is constantly in pain even lying down.

33. Staggs is currently having to take anxiety medicine to deal with the trauma of being surrounded by the same model gun and not knowing if one will go off as he did. Sudden noises result in a hypervigilant response and disturb her as never before. The burning smell of gunpowder oppresses his memory and nearly makes him nauseous. His life has changed completely since the gunshot injury.

## II. The Investigation of the Incident

41. In a memorandum dated December 2, 2020, GAO/ Homeland Security memorialized the investigation in the immediate aftermath of the incident.

42. Installing a Camera in Basement Armory:

> I looked at the pistol while it was inside the purse, I did not see anything on top of the pistol. When I was looking at the purse I was still on my knees, and I had turned to my left and was looking over my left shoulder. The pistol grip to the pistol was closest to me; the bottom of the magazine was closest to me and towards the

ground.  I saw the rear Smith & Wesson. The "paddle" portion of the holster was oriented to the window side of the officer.

DC Detective further stated: Plaintiff was instructed by the Detective that the weapon was being secure in DC headquarters for inspection. The Detectives arrived, took the bloody undergarments of the Plaintiff for evidence, and took several photographs.

(*emphasis* added)

43. Despite numerous existing lawsuits against MP9 - EZ Shield regarding un-commanded discharges of the MP9 as of the date. President Biden made announce for the Gun manufacturers to take full responsibility.

44. **On April 8, 2021, US President** Biden: **If I could do one thing on guns, I would allow people to sue gun manufacturers.**

45. As in every single other case involving an asserted catastrophic malfunction of the MP9, It speculated that some unidentified "foreign object" got inside the holster - - and inside the trigger guard, wrapped itself around the trigger, and  somehow overcame many pounds of trigger weight to pull it. The one-page report noted "scuff marks" and "gouges" that indicated a "foreign object" may have "enter[ed] the holster."

46. During the inspection and investigation of  Staggs gun, MPD took no photographs of the inside of his MP9 and did not review DC- Police Report investigation documents.

III. <u>**Smith and Wesson Safety Warranties Regarding the EZ Shield MP9**</u>

47. March 1, 2020, approximately 4-5 months after this incident occurred, Smith Wesson announced on their website a pistol recall for pistol manufactured by their supplier was cracked.

Identified as the MP Shield EZ Pistols  Quote:

11

Identified as the MP Shield EZ Pistols  Quote:











1. Recall notice for Smith Wesson Pistols

# RECALL NOTICE FOR SMITH WESSON PISTOLS

M&P SHIELD® EZ® PISTOL IMPORTANT SAFETY RECALL NOTICE FOR PISTOLS
MANUFACTURED BETWEEN MARCH 1ST, 2020 AND OCTOBER 31ST, 2020

Smith & Wesson has identified two M&P Shield EZ Pistols on which the hammers manufactured by our supplier were cracked.  In those firearms, the hammer failed to fully engage the sear, causing the round to fire, cycling the slide, and potentially resulting in multiple discharges without depressing the trigger. This issue can occur in the following two scenarios:

1. With a loaded magazine in the firearm and the grip safety depressed, releasing the slide (by pulling it back, or releasing the slide stop), may ignite the round as the slide closes, without engaging the trigger.  The condition may occur, regardless of the manual thumb safety position if equipped.  This may also result in multiple discharges.

2. With a loaded magazine in the firearm, the grip safety depressed, manual safety in the fire position, slide closed, and around in the chamber, pulling the trigger will cause the round to fire normally, however as the slide cycles, the next round may be ignited as it is chambered by the hammer failing to fully engage the sear, causing multiple discharges. In all cases, the firearm will NOT fire unless the grip safety is depressed.  While this condition has been found only in two hammers, and our investigation suggests that these two incidents are very isolated, any

14



unintended discharge of a firearm has                                      potential to cause

injury.

48. In additional marketing material, under the heading "Striker Safety," defendant
SMITH WESSON further states: The Striker Safety "[p]revents the striker from being released
*unless the trigger is pulled.*" (*emphasis* added).



49. At the same time, SMITH WESSON contradictorily stated in the original owner's manual
for the MP9, on page 25, that the weapon may fire if dropped without the trigger being pulled if

the chamber is not empty:

50. It is, however, a standard operating procedure for all U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

51. Smith and Wesson was aware of the latter fact at the time it deSmith & Wessonned



and manufactured all its pistols including the EZ Shield.

52. Sometime in 2017, after a Connecticut law enforcement agent was shot by an MP9 when it fell to the ground from less than three feet, it removed the warning on page 25 regarding chambered rounds, and replaced it with the following language:

(*emphasis* in original).

53. Never before had Smith Wesson, or any major gun manufacturer represented that mere "vibration" could cause the weapon to discharge

54. Smith Wesson also states in the recall for the **With a loaded magazine in the firearm and the grip safety depressed, releasing the slide (by pulling it back or releasing the slide stop), may ignite the round as the slide closes, without engaging the trigger.**

## COUNT I

## STRICT PRODUCT LIABILITY

55. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 95 of the Complaint, as though fully set forth herein.

56. Smith Wesson, by and through its agents, servants, workers, contractors, deSmith & Wessonners, assemblers, manufacturers, sellers, suppliers, and/or distributors, is strictly liable because:

   a. Smith Wesson is engaged in the regular business of deSmith & Wessonning, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the MP9 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Smith Wesson;

   c. The product was expected to and did reach users without substantial change in the condition in which it was deSmith & Wessonned, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce;

   d. The product was deSmith & Wessonned, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

57. The MP9 was in a defective condition as: (1) the danger contained therein was unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the MP9 outweighed the burden or costs of taking precautions.

58. Smith and Wesson breached its duties, by and through its agents, servants, workers, and/or employees, and was jointly and severally careless, negligent, grossly negligent, and/or reckless in the performance of its obligations.

59. The defective used condition of the MP9 Recall caused Plaintiff's injuries.

60. Smith and Wesson are therefore strictly liable to Plaintiff.

## COUNT II

### NEGLIGENCE

61. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 90 of the Complaint, as though fully set forth herein.

62. At all relevant times, Smith Wesson owed Plaintiff the duty to deSmith & Wessonn the MP9 weapon in such a manner and with the exercise of reasonable care, to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

63. At all relevant times, Smith Wesson owed Plaintiff the duty to manufacture, assemble, inspect and/or test its MP9s in such a manner and with the exercise of reasonable care, to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

64. At all relevant times, Smith Wesson owed a duty to unambiguously warn consumers and/or intended users of the MP9, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Smith Wesson knew or had reason to know that the MP9 posed an unreasonable risk of harm by informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery. 65. Smith Wesson breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i. By failing to use due care in deSmith & Wessonning and manufacturing the MP9 firing and striker assembly to prevent un-commanded discharges;
>
> ii. By failing to use due care in deSmith & Wessonning and manufacturing the MP9 internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iii. By failing to issue a mandatory recall of the MP9 as Smith Wesson had done in the  past with other defective products;

iv. By failing to make reasonable tests and/or inspections to discover the  defective, hazardous, and unreasonably dangerous conditions relating to the  gun's propensity to discharge un-commanded as described above;

v. By negligently failing to unambiguously warn purchasers and end-users of  the gun, including Ahern, of said defective, hazardous and unreasonably dangerous conditions relating to its deSmith & Wessonn and manufacture, which it knew  or should have known through the exercise of ordinary care;

vi. By failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Smith Wesson, and during which times employees, servants, or agents of Smith Wesson and Secure America had an opportunity to inspect, service and work on the gun;

vii. By negligently failing to place a warning about mere "vibration" of the gun  in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

viii. Other negligent acts and omissions to be developed in the course of discovery.

66. Smith and Wesson knew or should have known, that exposing users to the dangerous and used defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

67. The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

68. Smith Wesson negligence as alleged in this Count directly and proximately caused Oct 1, 2019, un-commanded discharge and Plaintiff's injuries resulting from the accident. 69. As a direct and proximate result of the negligence outlined in this Count,  Plaintiff suffers emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, PTSD and

loss of earnings and earning capacity. These injuries are either permanent or continuing in their

nature and Plaintiff will suffer such health losses and impairments in the future.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

70. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1

through 76 of the Complaint, as though fully set forth herein.

71. At all relevant times, Smith Wesson was in the business of marketing, selling,

and distributing weapons, including the gun causing Plaintiff's injuries.

72. Smith Wesson knew of the ordinary purposes for which the gun was intended and

impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which

included "vibrated" and handled while situated within and without a holster) and all other

reasonably foreseeable uses.

73. At all relevant times, Plaintiff used the gun in its intended manner and for its

intended purpose and reasonably relied on the skill, judgment, and implied warranty of MP9.

74. SMITH & WESSON breached the above-referenced implied warranties as to the gun

because at the time it left SMITH & WESSON's possession, it was not of merchantable quality

and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes

for which it was intended and its reasonably foreseeable misuses by virtue of:

> i. Failing to use due care Smith & Wesson and manufacturing the MP9 internal
> components, including its sear-striker connection, and by omitting a mechanical
> disconnect switch, so as to prevent un-commanded discharges.ii. Failing to issue
> a mandatory recall sooner of the MP9 as Smith Wesson had done in the past with
> other defective products.

> iii. Failing to make reasonable tests and/or inspections to discover the  defective,
> hazardous, and unreasonably dangerous conditions relating to  the gun's

propensity to discharge accidentally as described above;

iv. Negligently failing to unambiguously warn purchasers and end-users of the gun, including Ahern, of said defective, hazardous and unreasonably dangerous conditions relating to its deSmith & Wessonn and manufacture, which it knew or should have known through the exercise of ordinary care;

v. Failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of MP9, and during which times employees, servants, or agents of MP9 had an opportunity to inspect, service, and work on the gun;

vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

75. Plaintiff, as the end-user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and Smith Wesson breach of the warranty of merchantability as alleged herein directly and proximately caused the accident and Plaintiff's injuries.

76. As a direct and proximate result of the breaches outlined in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

## **COUNT IV**

## **BREACH OF EXPRESS WARRANTY**

77. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 82 of the Complaint, as though fully set forth herein.

78. At all times material hereto, Smith Wesson was in the business of marketing, selling, and distributing weapons, including the gun causing Plaintiff's injuries. Upon information and belief, MP9 knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was, in fact, relying on Smith Wesson skill, judgment, and implied warranty

21

of the gun's fitness for that particular purpose without firing.

79. Accordingly, Smith Wesson impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

80. At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of Smith Wesson in using and handling the gun and its MP9 Plastic-issued holster.

81. Smith Wesson breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left Smith Wesson possession by virtue of:

> i. Failing to use due care in deSmith & Wessonning and manufacturing the MP9's internal components, including its sear, and by omitting a mechanical disconnect
> switch, so as to prevent accidental discharges;
>
> ii. Failing to issue a mandatory recall of the MP9 as Smith Wesson had done in the past with other defective products;
>
> iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;
>
> iv. Negligently failing to unambiguously and conspicuously warn purchasers and end-users of the gun, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its deSmith & Wessonn and manufacture, which it knew or should have known through the exercise of ordinary care;
>
> v. Failing to discover the defective, hazardous, and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of Smith Wesson, and during which times employees, servants, or agents of MP9 had an opportunity to inspect, service, and work on the gun;
>
> vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

    vii. Expressly warranting that the gun would not fire unless the trigger was pulled.

82. As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity. These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and permanent impairments in the future.

## COUNT V

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a)

83. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 89 of the Complaint, as though fully set forth herein.

84. The MP9 is a consumer product as defined in 15 U.S.C. § 2301(1). 190.

Plaintiff is a consumer as defined in 15 U.S.C. § 2301(3).

85. At all relevant times, Smith and Wesson was a supplier and warrantor as defined in 15  U.S.C. § 2301(4) and (5).

86. In connection with the sale of the MP9 issued to Plaintiff in 2018, Smith Wesson made implied and express warranties, as defined in 15 U.S.C. § 2301(6), that the MP9 was safe for its intended purposes and would not fire un-commanded -- i.e., without a trigger pull. Plaintiff's MP9 was capable of firing, and did fire, without a trigger pull, contrary to Smith Wesson warranties.

87. Smith Wesson breached the warranties it made stating that the MP9 was safe for its intended and foreseeable uses and particular purposes.

88. Starting in 2017, Smith and Wesson has attempted to modify and/or disclaim the

implied and express warranties it made regarding the safety of the MP9 by stating that "vibration," "shock," and dropping on the ground, among other factors, could make the MP9 fire without a trigger pull.

89. Smith & Wesson's attempt to modify and/or disclaim its prior warranties regarding the safety of the MP9 violates section 2308(a) of the Magnuson-Moss Warranty Act (the "Act").

196. Smith and Wesson's violation of the Act has been the direct and proximate cause of substantial economic and non-economic damages incurred by Plaintiff.

## COUNT VI

### Gross Negligence

90. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 95 of the Complaint, as though fully set forth herein.

91. Smith Wesson's, Liberty Mutual, American Security Programs acts and omissions constitute gross neglect. Viewed objectively from the standpoint of Smith Wesson at the time of the occurrence, Smith & Wesson acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff and Smith Wesson had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Plaintiff. As a result of the gross neglect of Smith and Wesson, Plaintiff was exposed to and did sustain a serious and grievous personal injury.

92. Smith Wesson's, Liberty Mutual, American Security Programs gross negligence directly and proximately caused Plaintiff's injuries. 93. Exemplary damages are therefore mandated for Smith Wesson's misconduct and violations of law.

## COUNT VII

### Resulting Legal Damages

94. Smith Wesson's, Liberty Mutual, American Security Programs acts and omissions caused Plaintiff to sustain legal damages.

95. Plaintiff is entitled to be compensated for the personal injuries and damages that he has sustained and will sustain, including:

i. The amount of medical expenses necessarily incurred in the treatment of Plaintiff's injuries from the date of the incident in question up to the time of trial;

ii. The amount of medical expenses in the treatment of Plaintiff's injuries that, in reasonable medical probability, will be incurred in the future;

iii. The physical pain and suffering in the past that Plaintiff has suffered from the date of the incident in question up to the time of trial;

iv. The physical pain and suffering that, in reasonable probability, Plaintiff will suffer from in the future;

v. The mental anguish that Plaintiff has suffered from the date of the incident in question up to the time of trial;

vi. The mental anguish that Plaintiff, in reasonable probability, will suffer in the future;

vii. The damages resulting from the physical impairment suffered by and the resulting inability to do those tasks and services that Plaintiff ordinarily would have been able to perform;

viii. The damages that, in reasonable probability, will result in the future from the physical impairment suffered by and the resulting inability to do those tasks and services that Plaintiff ordinarily would have been able to perform;

ix. The disfigurement which Plaintiff has suffered from the date of the incident in question up to the time of trial;

x. The disfigurement which Plaintiff will, in reasonable probability, suffer from in the future;

xi. The loss of any earnings sustained by Plaintiff from the date of the incident in question up to the time of trial; and

    xii. The loss or reduction in Plaintiff's earnings or earnings capacity in the future beyond the time of trial.

96. Plaintiff is entitled to pre-and post-judgment interest at the maximum legal rates. 97. Further, Plaintiff is entitled to exemplary damages due to Defendant's negligence and gross negligence in the amount of $15 million.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that he have a judgment against Defendant for actual damages in excess of the minimum jurisdictional limits of this Court, pre-and post-judgment interest as allowed by law, costs of suit, and all other relief, at law or in equity, to which Plaintiff may be justly entitled.

Dated: September 28, 2021

Respectfully submitted,

Dayna Staggs
Federal Bar No. VA176996
Pro Hac Vice application to be filed
DS Global Ltd &
Associates LLC
137 National Plaza Suite 300,
National Harbor, MD 20745
(347) 273-8144
daynastaggs@dsgloballtda
ssociaesllc.com

**ATTORNEYS FOR PLAINTIFF**

# RECALL NOTICE FOR PISTOLS

M&P SHIELD® EZ® PISTOL IMPORTANT SAFETY RECALL NOTICE FOR PISTOLS MANUFACTURED BETWEEN MARCH 1ST, 2020 AND OCTOBER 31ST, 2020

Smith & Wesson has identified two M&P Shield EZ Pistols on which the hammers manufactured by our supplier were cracked. In those firearms, the hammer failed to fully engage the sear, causing the round to fire, cycling the slide, and potentially resulting in multiple discharges without depressing the trigger. This issue can occur in the following two scenarios:

1. With a loaded magazine in the firearm and the grip safety depressed, releasing the slide (by pulling it back, or releasing the slide stop), may ignite the round as the slide closes, without engaging the trigger. The condition may occur, regardless of the manual thumb safety position if equipped. This may also result in multiple discharges.

2. With a loaded magazine in the firearm, the grip safety depressed, manual safety in the fire position, slide closed, and a round in the chamber, pulling the trigger will cause the round to fire normally, however as the slide cycles, the next round may be ignited as it is chambered by the hammer failing to fully engage the sear, causing multiple discharges.

In all cases, the firearm will NOT fire unless the grip safety is depressed. While this condition has been found only in two hammers, and our investigation suggests that these two incidents are very isolated, any unintended discharge of a firearm has the potential to cause injury. Therefore, we have established this Safety Recall as a precautionary measure to ensure that all M&P Shield EZ Pistols in service meet our design specifications.

Stop using your M&P® Shield™ EZ pistol until you determine whether it is included in this safety recall, and if so, until it has been inspected and repaired by Smith & Wesson, if necessary.

PRODUCT AFFECTED:

This notice applies ONLY to M&P® Shield™ EZ pistols (including Performance Center® models) manufactured between March 1, 2020 and October 31, 2020, and only to a small percentage of that population. It does NOT apply to all SHIELD™ pistols. To determine whether your M&P Shield EZ Pistol is affected, check the label on the box to determine date of manufacture (see image below), and if manufacture date is between March 1, 2020 and October 31, 2020 – your pistol may be affected. In this case (or if you are unsure of your date of manufacture), simply go to MPShieldEZrecall.com and input your serial number, or call 888-871-7114 .

FOR OWNERS OUTSIDE THE UNITED STATES:

9/23/21, 4:45 PM                          Recall notice for Pistols | Smith & Wesson

For M&P Shield EZ Pistol owners outside the United States, see our list of Authorized Warranty Centers available at **smith-wesson.com/customer-service/warranty-stations**, who will inspect your pistol and replace your hammer as necessary.

☰            ⊙ **Smith&Wesson®**                              📍

FOR DEALERS/DISTRIBUTORS/RETAILERS:

1. If you have less than 5 affected firearms, please input your serial numbers to receive return labels. If you have 5 or more affected pistols in inventory, please call 888-871-7114 and we will coordinate a pickup of the affected firearms. In either case, the firearms will be expedited to our facility, repaired, and returned to you ASAP.

2. For those pistols on the list which you have already sold, we ask that you provide us with the names, addresses, telephone numbers and e-mails of customers to whom you have sold them to.  Please send this information to us electronically at

   **MPShieldEZrecall@smith-wesson.com**.  If you do not have the capability to return the form electronically, please call 888-871-7114.  This information is vital to ensure that notice of the recall is given to all affected purchasers.  Once we receive this information from you, we will immediately arrange to provide notice of the recall directly to your customers.

REMEDY/ACTION TO BE TAKEN:

If your M&P Shield EZ Pistol is included in this recall, we will arrange for the return of your firearm to Smith & Wesson for inspection.  After inspection, if the hammer from your firearm is affected, it will be replaced at no cost to you.  We expect that this entire process will take no longer than 10 business days, and your pistol will be returned as quickly and efficiently as possible.  All shipping and replacement costs will be covered by Smith & Wesson.

HOW TO LOCATE YOUR SERIAL NUMBER AND DATE OF MANUFACTURE:



NOT ALL M&P SHIELD EZ PISTOLS MANUFACTURED BETWEEN MARCH 1, 2020 AND OCTOBER 31, 2020 ARE INCLUDED IN THIS RECALL.

  

JEFFREY S. BAGNELL

## JEFFREY S. BAGNELL, ESQ., LLC

55 GREENS FARMS ROAD, #200-60
WESTPORT, CONNECTICUT 06880

203-984-8820     JBAGNELL@BAGNELL-LAW.COM     BAGNELL-LAW.COM

*Admitted in Connecticut and Massachusetts

April 16, 2020

VIA EMAIL

Clem C. Trischler, Esq.
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
One Oxford Centre, 38th Floor
Pittsburg, Pennsylvania 15219

Re:    Officer Danya Staggs/Smith & Wesson

Dear Attorney Trischler:

This will confirm that my office represents Dayna Staggs in connection with an un-commanded discharge of a Smith & Wesson MP9 on October 1, 2019 at 441 G Street NW in Washington, D.C.

My investigation of the incident to date has disclosed the following information:

On October 1, 2019, Special Police Officer Staggs DC, License Number (SPO #205693), arrived for Federal Police duties at 10:29 p.m. at the Government Accountability Office at 411 G Street NW. Upon arrival, he was instructed by a Centerra Group supervisor, Thomas Ofosuhene, to change his shirt after roll call. He informed Ofosuhene that he had received text messages from a GAO Supervisor instructing him to "please remember to bring both sets of shirts and gun belts tonight. You will wear Centerra/Constellis, gear until midnight, then change to American Service Protection (ASP) shirts and gun belt at midnight."

On or around 11 pm, Staggs was patrolling 411 G Street as Post #18 on foot patrol as a roving exterior officer. At the time he was carrying a Glock 17, issued by the Centerra Group. He made contact with two-way radio at the beginning and ending of his patrol with GAO Command Center dispatchers Patrick and Pamela Butcher.

Upon patrol completion, he returned to the command center. Staggs was then instructed by GAO security manager, Duane Harding, to change uniforms. Harding stated, "why aren't you guys in American Service Protection uniforms." Staggs responded "we switch at midnight sir." Harding then proceeded downstairs to the basement level to the GAO command center to inquire about the matter to police management.

Clem C. Trischler
April 16, 2020
Page 2

      At around 11:30, Staggs went to the command center.  He was then instructed by Lt. Harley Smith and Harding to switch uniforms and duty gear.

      At midnight Officer Staggs disarmed, safely unloading his Glock 17 inside the armory in the basement level of the GAO command center.  Smith and a Mr. Singletary then armed him with a striker-fired Smith & Wesson MP9.  At that time, while attempting to place the MP9 in its holster, it discharged without him pulling the trigger.  My information is that the discharge was witnessed by Lt. Smith and that no trigger pull occurred.  Smith immediately reacted and advised Staggs "not to move" as "it might go off again."

      The round caused a close range gunshot wound, ripping leg muscles apart and causing serve internal bleeding to Stagg's leg muscles, as described by Medstar Washington Hospital Center emergency room trauma doctors.  The 9mm caliber bullet and fragments remains lodged into his right calf muscle and lower leg.  After reviewing the extent of the injuries, it is my assessment that it is unlikely that he will ever work again in the capacity of a police or security officer of any kind.  He has substantial medical expenses and lost wages.

      I would like to discuss this matter with you at your convenience.

                               Sincerely,

                               Jeffrey S. Bagnell

cc:    SPO Dayna Staggs
       David Synder, Esq.

**AUTHORIZATION DEMANDED BY METROPOLITAN POLICE DEPARTMENT FOR RELEASE OF DOCUMENTS/MATERIALS AFTER F.O.I.A. REQUEST SUBMISSION**

RE: _____ Officer Dayna Staggs _____

FILE NO.: ___ S&W-113953 _____

FROM:
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
38th Floor, One Oxford Centre
Pittsburgh, PA 15219
(412) 263-2000

TO:

Metropolitan Police Department _____

300 Indiana Avenue, Northwest Room 4002 

Washington, DC 20001 _____

I hereby authorize and direct you to release documents and materials requested (#2020-FOIA-05398) to an authorized representative of PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP.

I agree that a photostatic copy of this authorization shall be considered as effective and valid as the original.

7-8-20 
(DATE)

_____
(EMPLOYEE SIGNATURE)

Dayna Staggs _____

27710 King William Rd West Point VA 23 
(ADDRESS)

12-14-1968 
(DATE OF BIRTH)



38TH FLOOR   ONE OXFORD CENTRE   PITTSBURGH, PA 15219
412.263.2000     FAX: 412.263.2001
WWW.PIETRAGALLO.COM

DIRECT DIAL NO.: 412.263.1816
DIRECT FAX NO: 412.263.4246
FILE NO: S&W-
E-MAIL: CCT@Pietragallo.com

April 8, 2020

*Via Electronic Mail*

Jeffrey S. Bagnell, Esq.
BAGNELL LAW
55 Greens Farms Road, 200-60
Westport, Connecticut 06880
jbagnell@bagnell-law.com

      Re:    Your client: Officer Staggs/Dayna Staggs
               Incident date: October 1, 2019

Dear Mr. Bagnell:

    Please be advised that I represent Smith & Wesson Inc. ("Smith & Wesson"). I write to you because my client received a telephone call through its customer service team from Dayna Staggs. Ms. Staggs reportedly was calling on behalf of "Officer Staggs" to report an incident involving a Smith & Wesson firearm. Unfortunately, no serial number or details of the incident were provided. In fact, the only information which Ms. Staggs provided to Smith & Wesson's customer service agent was your name suggesting that you and another attorney (David Schneider?) were representing Mr. Staggs in this matter.

    My purpose in this writing is simply to follow up in this communication. If you are, in fact, representing Officer Staggs, I ask that you contact me so that I can obtain some information concerning this claim.

    Thank you for your attention to this matter and I look forward to hearing from you.

                  Very truly yours,

                  Clem C. Trischler

CCT:ren

CCN #19174717 – Event # 19174717 Public Incident Packet

## CCN #19174717 – PUBLIC INCIDENT REPORT

| REPORT DATE / TIME | DISTRICT / PSA | EVENT START DATE / TIME - EVENT END DATE / TIME |
|---|---|---|
| Oct 01, 2019 01:54 | First District / 101 | Oct 01, 2019 00:20 - Oct 01, 2019 00:25 |

| RESPONDING OFFICER | | WEATHER |
|---|---|---|
| Walker Cleary (#11744) – MPD | | Cloudy |

ASSISTING OFFICER (ASSIST TYPE)

John Adjetey (#11028) [Assisting Officer]

| TELETYPE DATE / TIME | TELETYPE # | PERSON NOTIFIED AT TELETYPE |
|---|---|---|
| | | |

| | | SHOTS FIRED | SHOTS EFFECTIVE |
|---|---|---|---|
| | | ☐ YES ☒ NO | ☐ YES ☐ YES |

## REPORTING PERSON

NAME

R-1 HARLEY EDWARD SMITH

HOME ADDRESS

4503 RENA RD, SUITLAND, MD 20746, UNITED STATES, 6531 LIVINGSTON RD, OXON HILL, MD 20745, UNITED STATES

## PROPERTY & ITEMS

| STATUS / REASON FOR CUSTODY | DESCRIPTION | QTY | DECLARED / FORFEITURE VALUE |
|---|---|---|---|
| Seized / Evidence | Smith and Wesson MP9 Smith & Wesson | 1 | |

## CCN #19174717 – PUBLIC NARRATIVE

On October 1, 2019, officers responded to 441 G St. NW for a shooting. Once on scene, officers located SUB-1 who was suffering from a gunshot wound to the upper right leg. W1 stated that SUB-1 had been in the weapons clearing room attempting to place the firearm in his holster when the firearm discharged. SUB-1 was transported to the hospital by Medic 2 for further medical treatment.